**FLUOR ENTERPRISES, INC. f/k/a/ Fluor Daniel, Inc. and Leslie Antalffy, Appellants,**

v.

**CONEX INTERNATIONAL CORPORATION, Appellee.**

No. 09–07–100 CV.

Court of Appeals of Texas, Beaumont.

Submitted on Dec. 13, 2007.

Decided Dec. 18, 2008.

**432**

Kent M. Adams, Russell W. Heald, Adams & Boswell, P.C., Beaumont, James Gascoyne, Gascoyne & Bullion, Sugar Land, Marie R. Yeates, Penelope E. Nicholson, Gwen J. Samora, Vinson & Elkins, L.L.P., Houston, for Appellants.

Randal Cashiola, Chambers, Templeton, Cashiola & Thomas, Hamil M. Cupero, Jr., Conex International Corp., Beaumont, Kenneth R. Chambers, Chambers, Templeton, Cashiola & Thomas, Richard P. Hogan, Jennifer Bruch Hogan, Matthew E. Coveler, Hogan & Hogan, L.L.P., Houston, for Appellee.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

CHARLES KREGER, Justice.

Fluor Enterprises, Inc. f/k/a Fluor Daniel, Inc., and Leslie Antalffy appeal a $100 million judgment awarded to Conex International Corporation on claims for tortious interference with existing contracts, business disparagement, and tortious interference with prospective contracts. In 2001, Conex entered into a contract with Atofina for a turnaround project at Atofina's Port Arthur facility. Some time later, in September 2001, Atofina hired Fluor as a consultant on part of the turnaround project to provide engineering advice for a head-to-shell weld and eventually on guidelines for post weld heat treatment of that weld and various other welds performed by Conex and its subcontractors. Conex contends that in the course of a 2001 turnaround at an Atofina facility, Fluor and its employee Antalffy disparaged Conex to their mutual client, Atofina. Because we find the evidence supporting the jury's liability findings is factually insufficient, we reverse the judgment and remand the case for a new trial on Conex's claims against Fluor. Because the evidence supporting the jury's liability findings as to Antalffy is legally insufficient, we render judgment that Conex take nothing as to Antalffy.

The appellants challenge the legal and factual sufficiency of the evidence supporting the jury's findings regarding liability on Conex's claims for business disparagement and tortious interference. In a challenge to the legal sufficiency of the evidence regarding an issue on which the appellant did not have the burden of proof, we "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a no evidence challenge if:

(a) there is a complete absence of evidence of a vital fact,

(b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact,

(c) the evidence offered to prove a vital fact is no more than a mere scintilla, or

(d) the evidence conclusively establishes the opposite of the vital fact.

*Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997) (citing ROBERT W. CALVERT, "NO EVIDENCE" AND "INSUFFICIENT EVIDENCE" POINTS OF ERROR, 38 Tex. L.Rev. 361, 362–63 (1960)). In a factual sufficiency review, we consider and weigh all the evidence, and will set aside the verdict only if the evidence is so weak or the finding is so against the great weight

and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

█ The appellants' first issue challenges the legal and factual sufficiency of the evidence supporting Conex's claim of business disparagement. To prevail on a business disparagement claim, the plaintiff must prove: (1) publication by the defendant of false and disparaging words about the plaintiff; (2) malice; (3) lack of privilege; and (4) special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). In this case, the trial court asked the jury for findings on eight statements. In this context, we address the evidence relevant to each statement to determine if the jury's positive findings are supported by sufficient evidence.

The first statement appears in an email dated September 19, 2001, from Atofina employee John Walls, to twelve people, including Conex employee Steve Pellerin, Atofina employee John Carrens, and Fluor employee Leslie Antalffy. The email includes the following sentence, found by the jury to be a disparaging statement published by both Fluor and Antalffy about Conex: "WRC 452 is the recognized document in the industry to satisfy this requirement, i.e., you can't just slap up the high temperature bands and call it done without checking it out." [1]

█ First, the appellants contend this statement was not made by Antalffy or Fluor. The email's author, John Walls, was an employee of Atofina. The document purports to contain the highlights of a meeting conducted earlier that day and attended by three Atofina employees (including Walls), two Fluor employees (including Antalffy), and Vince Cuccio of Conex. Because the email memorializes a

meeting attended by Antalffy, it is possible that the statement at issue reveals a statement that Antalffy or the other Fluor employee made during the meeting. Cuccio testified that Antalffy and Walls were having an "animated conversation about the use of something I had never heard before, WRC–452, as being like the recognized standard or requirements for this job." According to Cuccio, Antalffy said, " 'John, isn't that correct, this WRC–452 is the recognized standard for the post weld heat treating.' " Cuccio did not attribute to Antalffy any comment about slapping up high temperature bands without checking. Moreover, Walls's email does not state that Conex had done anything without checking, or that Antalffy or anyone else at Fluor had stated that Conex had done anything without checking it. Cuccio indicated that the discussion was about the procedures for the upcoming turnaround. Thus, as to the first statement, there is no evidence that either Fluor or Antalffy made a false disparaging statement about Conex.

The second and third statements appear in an email sent by Walls on October 24, 2001. The jury found Fluor made the following statements, and that Conex was by implication one of the "constructors" mentioned therein, as follows:

> "Since heat treating is a specialized service industry, *the expectation is that* they and *the constructors that use them would keep up with the technical requirements and developments in that industry and have the expertise to implement them.* Unfortunately, that is not always the case. In the past, *some vendors may have ignored the evaluation requirement because it was difficult to do.*" (emphasis added).

---

1. "WRC" refers to Welding Research Council.

The drafts of this email and the distributed version were sent to George Miller, a Fluor engineer. Walls asks both Miller and Antalffy to "please advise if I have misquoted any of this or if you have something to add." Walls wrote on an early draft of the email that "[t]he intent is to make sure my management understands why we are doing this." The stated purpose of the email is to describe the "high points" of a discussion Walls had with Miller "about the science involved in PWHT and how it has changed over the years." [2] The statements Conex contends are defamatory were added in an interim draft of the document. Since the email describes a discussion between Walls and Miller, it is possible the Fluor employee made statements that are reflected in the document. There is, however, no evidence that the statements referred specifically to Conex. The document is about a procedure being performed by Conex or its subcontractors, but the statements do not imply that Miller had stated as a fact that Conex lacked the expertise to implement the technical requirements or that Conex had ignored an evaluation requirement in the past.

■■■ A statement, both false and critical, can only be defamatory if it is directed at the plaintiff. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex.2000) (defamation by media defendant). That requirement can be met, however, if the persons to whom the communication is directed would understand from the publication that it referred to the plaintiff. *See Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 894 (1960) (defamation by media defendant). Although Conex was supervising the post weld heat treatment, the alleged disparaging statements in the October 24 email

referred to past acts by unnamed contractors who were not tied in any manner to the Atofina facility or to Conex. The reader who knows that Conex is the contractor for the present post weld heat treatment would not understand that the general reference to what contractors did in the past referred to Conex's behavior in the past or that Conex lacked the expertise to perform its job. Direct evidence was not adduced at trial that anyone other than the principals of Conex understood from this publication that it referred to Conex.

■■■ Conex argues the unidentified contractors and vendors were juxtaposed with the name of Conex—the only contractor specifically named in the document—in such a way that the statement created a substantially false and defamatory impression. *See Wood v. Dawkins*, 85 S.W.3d 312, 317 (Tex.App.–Amarillo 2002, pet. denied) (defamation). In addition, two days earlier Walls sent some of the recipients of the October 24 email another email that stated that Conex had caused a problem because the impact of the procedure Conex performed on October 3 "was unevaluated." Although the October 24 email cannot be understood to refer to Conex, a person who had read the October 22 email (and was therefore aware that Walls had stated that Conex had caused a problem in the 2001 turnaround) might understand that the October 24 email referred to Conex's performance on the Atofina job. Although both emails were sent by an Atofina employee, the jury could reasonably infer that Miller was the source of the information. For instance, the word "evaluation" appears only in the final draft prepared after Miller reviewed the document. Conex's having left some metal unevaluated on October 3 had been mentioned in the

---

**2.** "PWHT" means "post weld heat treatment" and is a process used by Conex and its sub-

contractors in the 2001 turnaround.

previous email. The jury could reasonably infer that the statement referred to Conex, because similar words were used in an email about Conex a few days earlier. Nonetheless, the October 24 email does not state a positive assertion of fact, but clearly qualifies that some vendors may have ignored the evaluation requirement. Taken in context, the statement cannot be disparaging because it does not imply that Conex had in fact ignored an evaluation requirement on October 3.

■ The fourth statement, which the jury found both Antalffy and Fluor published, was Antalffy's emailed reply to Walls's email of October 24, 2001: "You hit the nail on the head. Your response was exactly correct." Uttering an agreement with a defamatory statement can constitute defamation. *See Bentley v. Bunton,* 94 S.W.3d 561, 603 (Tex.2002) (defamation). Antalffy's communication did nothing more than express agreement with Walls's email. On appeal, Conex argues that this statement was disparaging because "Fina does not want to hire contractors who create problems by not doing things right, or who damage Fina's equipment by using improper procedures, or who create high residual stresses, or who walk away from the job thinking it was done successfully when it was not." Antalffy refers to Walls's document as a whole, and expresses an opinion agreeing with it, but Antalffy's words do not refer to Conex. There is no evidence that by expressing agreement with Walls's email, Antalffy was agreeing that a factual statement about Conex was true that Antalffy knew to be false. *See id.* at 603–04. Thus, there is no evidence that the fourth statement disparaged Conex.

The remaining statements, all attributed to Fluor but not to Antalffy, were contained in the email disseminated by Walls on October 22, 2001, which reads as follows:

Simply put, the weld was field PWHT'd in such a fashion that it created very high residual stresses in a concentrated area, and the solution was to re PWHT with a proper procedure to remove the residual stresses. The details are as follows:

Conex/AmeriTek submitted a plan for the PWHT of this nozzle with the rest of the Rx PWHT plan on 10/5/01. (Note that the requirement for Conex to submit a plan and the requirement for the investigation/design of this cook by Fluor was specifically stated in the 10/02/01 AM meeting with Conex/Fluor(phone)/ATOFINA—see notes of meeting) We found out on 10/7/01 that Conex had already stress relieved the weld on 10/03/01. We requested info on the procedure used, received a verbal response from Conex (Vince Cuccio), and sent the details to Fluor (George) for *evaluation. Conex's procedure consisted of a 8″ wide heat band with 2′ of 2″ thick insulation inside and outside, with a soak temp of 1350F for 2 hours, and heat/cool rates of 400F/hr. This created two problems—1) it exceeded the documented extra PWHT time for the new nozzle (we had 1.5 hrs at 1250F left per the test coupon—coupon no longer available), and 2) the impact of the procedure on the metal was unevaluated.* George *did a FEA and found that there were very high residual stresses, primarily concentrated in a small area just at and above the nozzle to elbow weld* (existing 48″ elbow welded to new nozzle). Note that he did an elastic analysis first, which indicated significant problems, so he did the more tedious elastic/plastic analysis for the basis of his assessment. George was especially concerned about the highly concentrated configuration of the high residual stress-

es. At this point (10/9/01 AM), George requested that the Fluor metallurgist (Terry Phillips) get involved. *Terry reviewed the issue and advised that the residual stresses would likely lead to loss of creep life.* Terry advised that we have two options—1) We could assess the tensile strength left and, if ok, do another PWHT to relieve the residual stresses or 2) Calculate the long term creep life loss and predict time to creep failure to see if we could accept that. We requested that Fluor pursue both options for review. Terry requested, and Conex provided, hardness readings for the nozzle and elbow and a wet mag particle test of the inside of the weld (just above the weld overlay)—model showed inside was in tension, so the wet mag was to check for surface cracks-limited help since weld overlayed up to just above the weld. The wet mag showed no indications (verbal from Conex). The original Xray was clear per Conex. The hardness readings were evaluated by Terry who determined that there was sufficient remaining strength (utilizing ASME Section II, Part A, SA–370, Table 2B) to perform another PWHT (can predict tensiles within 5% accuracy per Terry if we have accurate BHN's). In fact, the BHN's were higher than expected (some speculation that this may have been caused by the likely rapid cool down of the cook due to the massive amount of metal the nozzle is connected to). Terry recommended that we do a recook at the 1100F code minimum since we were attempting only to relieve the *residual stresses created by the first PWHT,* and the 1100F should be adequate for that. By this hour, Terry was running out of time (headed out of town until next week) and the other exercise of defining remaining creep life had turned out to be more than could be

done today (plus other Fluor resources required that were not in). Since there was need for a quick answer (due to schedule), a general preference to not accept loss of design life (especially if undefined), and a strong concern about the highly concentrated configuration of the high residual stresses, Terry recommended that we opt for the 1100F re PWHT solution. Fluor was instructed to proceed with the 1100F re PWHT FEA and advise us of the solution for the rePWHT asap. This was done and issued 10/10/01 PM. (emphasis added).

The fifth statement attributed to Fluor is that Conex had created two problems with the procedure it employed in the October 3 post weld heat treatment; namely, that Conex had exceeded the documented extra PWHT time for the new nozzle and that the impact of the procedure on the metal was unevaluated. Fluor contends this statement cannot be attributed to Fluor because it was made by an employee of Atofina. Although the email's author was not an employee of Fluor, Walls identifies Fluor employee Miller as the source of the information from which Walls concludes that Conex's procedure created the two problems.

The appellants contend the statement about the metal being unevaluated is also true, as Conex had performed the first PWHT on October 3. They also argue that the statement that Conex "exceeded the documented extra PWHT time" is true. A series of emails confirms that on September 21 and September 24, Walls and other Atofina employees were aware that they had only one PWHT remaining. One email included the following statement: "Note that the remaining PWHT time for the material at the field shell-to-shell weld is 1.5 hours." James Duplissey testified that Conex received a copy of the email that said there was only one more "cook"

left and admitted that Conex was reminded on September 24 that they had only one PWHT remaining on the reactor and the tower. Conex's expert witness testified that to meet code, Conex had to go to a temperature of 1350°F and hold it for two hours. Conex's expert agreed that if the PWHT time exceeded the test coupon, they could not do another correct PWHT compliant with code. On appeal, Conex does not direct the Court's attention to evidence in the record which establishes that the fifth statement is false. Conex contends that the fifth statement is misleading in light of the other statements in the documents.

The sixth statement, that Miller performed a finite element analysis, or FEA, and found high residual stresses, is literally true. According to expert testimony offered at trial by Conex, however, the email does not reveal that Miller's FEA was faulty and contained significant mathematical and analytical errors. Miller failed to convert from minutes to hours a figure used in a calculation, thereby making the result of the calculation sixty times greater than it should have been. Fluor did not show Atofina that its own PWHT procedures exceeded yield or twice yield. "Twice yield" was a figure—38,000 p.s.i.— that Fluor used in its report to represent the maximum stresses when the true figure was much higher. If Fluor had not made the mistake in failing to convert minutes to hours, its model would have shown it would not have met its own maximum limit of 38,000 p.s.i. According to Conex's expert, the type of stresses involved are not primary stresses and twice yield is not applicable. Conex's expert opined that Fluor's FEA model was also shown to be wrong because the model was run with nonlinear or plastic properties on the main material but not on the cladding on the inside liner of the vessel; Fluor used the wrong material in its calculations.

Fluor also incorrectly used a variable heat transfer coefficient, thereby creating material errors in the temperatures assigned in Fluor calculations. According to Conex's expert, the residual stresses were confined to an area of a few inches nearest to the weld site, not where Fluor was causing the heating bands to be placed. In his opinion, it would not be possible to put harmful thermal gradients by heat treating the vessel nor could the vessel be cracked by the heat treatment. He concluded that Fluor misled Atofina "about the risks of not going way beyond the [A.S.M.E.] code requirements." Thus, Conex argues, the sixth statement included a conclusion—that Conex had created high residual stresses—that was false.

Conex's expert also identified what in his opinion constituted a misrepresentation by Fluor in its analysis of another vessel. In its report, Fluor referred to stress intensity, but when Fluor graphed the circumferential head-to-shell weld, Fluor called it equivalent stress, which is different from stress intensity. The head-to-shell weld exceeded the limit Fluor set. According to the expert, "Fluor took the wrong—not the wrong time—took the time that wasn't maximum. And even the time they took wasn't meeting 38,000. So, they went to a different definition of stress and presented that to be less than 38,000. That is misrepresentation." According to Conex's expert, the FEA would not have given much information anyway, because there was nothing with which to compare it. In his opinion, a finite element analysis was unnecessary for a "standard, everyday post weld heat treat[ment] on a normal vessel with no complicated geometry." The expert expressed his opinion that

"it shows—a careless analysis by an engineer or engineering company to have so many errors in a finite element analy-

sis for something that they call so important that's gonna cost millions of dollars to implement, they should have had what's called quality control verification, quality assurance. If somebody does it, somebody else is gonna check it."

Fluor engineer Kenneth Kirkpatrick testified that he recalled Miller doing some finite element analyses and recalled "reviewing his reports and analyses for that particular job." According to Kirkpatrick "we always checked each other's work." Kirkpatrick testified that he checked Miller's 2001 Atofina FEA, that they set up a model and ran it, and that he reviewed the result Miller provided for the analysis. They also checked the input parameters. Kirkpatrick did not discover the mistake in 2001. He subsequently developed a set of spreadsheets that populate this data automatically into the program.

The seventh statement—that Fluor metallurgist Terrell Phillips reviewed the issue and advised that the residual stresses would likely lead to loss of creep life—according to Conex's experts, is misleading even if it is true that Phillips reviewed the issue and concluded that the residual stresses were likely to lead to the loss of creep life. Phillips testified that he was about to leave town when the issue arose, and he could not recall whether he did the review or merely suggested that it be done. One of Conex's expert witnesses testified that creep is time-dependent plastic strain caused by pressure loads of dead weight and involving pressure and high temperature over time, but is not caused by residual welding stresses. The weld metal and the base metal have different creep properties, as does the base metal away from the weld. The witness testified that creep "has nothing to do with post weld heat treating."

Conex's expert engineer testified that while it is true that "vessels like this have cracks," the cracks and residual stresses are caused by the process of welding. Thus, there is some evidence that the eighth statement—that residual stresses were caused by the first post weld heat treatment—is false because Conex adduced expert testimony that the cracks and residual stresses were caused by the welding, not by the *post* weld heat treatment performed by Conex's subcontractor.

▉▉▉▉ Conex produced some evidence that Fluor published the statements contained in Walls's October 22 email, that the statements were false or left a false impression, and that the statements were about Conex. The statements refer to Conex's performance of its job in the 2001 Atofina turnaround, and suggest that Conex had created a problem that required Atofina to risk damaging its vessels by running a second post weld heat treatment. The appellants contend that the statements six through eight express nonactionable opinions, not facts. The expression of a professional opinion is generally a constitutionally-protected exercise of free speech. *See Morris v. Blanchette,* 181 S.W.3d 422, 424 (Tex.App.–Waco 2005, no pet.) (libel). In this case, however, the statements of opinion could reasonably imply false and defamatory facts. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (defamation by media defendant). Because the facts implied within the statement were susceptible of being objectively verified as true or false, the statements were not mere opinion. *See Morris,* 181 S.W.3d at 424.

▉▉▉▉ The appellants contend that even if the statements are defamatory, Conex produced legally and factually insufficient evidence that Fluor and Antalffy acted with malice. To prevail on a business disparagement claim, the plaintiff must prove that the statements were made

with knowledge of the falsity, with reckless disregard as to the statements' truth, or with ill will or an intent to interfere with the plaintiff's economic interest. *Hurlbut,* 749 S.W.2d at 766. Reckless disregard is established by evidence that the defendant in fact entertained serious doubts as to the truth of the statements. *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989) (defamation of public official).

Conex argues that Fluor spoke with reckless disregard as to the truth of its statements. Atofina hired Fluor to evaluate Conex's procedures and to provide guidelines for the contractor to develop procedures for the post weld heat treatment. Thus, Fluor was acting within the scope of its work for Atofina when Miller performed the finite element analysis and reported his results to Atofina. Conex argues the work was done so poorly that it establishes reckless disregard for the truth of Fluor's assessment of the post weld heat treatment performed by Conex and its subcontractors.

Conex's expert testified that a finite element analysis requires careful effort and substantial time, and he was not surprised that Fluor made mistakes when Fluor attempted to accomplish it in about one month. Phillips raised the issue of loss of creep life, the possibility of which was then communicated to Atofina, without first performing his own calculations to confirm that there was a loss. Although Kirkpatrick checked Miller's finite element analysis, he did not catch the mistakes Miller had made. Conex argues the evidence supports the inference that Fluor deliberately ignored the results of its own analysis. One of Conex's experts testified that Fluor graphed the circumferential weld "they said it is in stress intensity," but when they graphed it they used the "wrong stress to compare with." Fluor also showed the end of the hold time in its report, when it should have looked at the beginning of the hold time. "If they had done that, they would have had a temperature of 55,000, way over 38,000. This was totally ignored." Conex's expert expressed his opinion that making the comparison with the wrong sort of stress and using the end of the hold time instead of the beginning was not a mistake, but was misrepresentation.

The jury could have found from the evidence that Miller made substantial errors in his finite element analysis sufficient to undermine confidence in the conclusions reached in Miller's report. This is not a suit for professional negligence, and Miller's errors are at issue only to the extent that they supply circumstantial evidence of Fluor's or Antalffy's malice. As Conex argues in its brief, the issue is whether the jury could find that either or both defendants did in fact entertain serious doubts as to the truth of the statements about Conex contained in Walls's October 22 email. The fact that the errors appear in the analysis and Conex's expert could identify them but Fluor failed to spot the errors, coupled with Conex's expert's testimony that two of the errors were misrepresentations rather than errors or mistakes, is some evidence that Fluor had reason to doubt the reliability of the finite element analysis that revealed high residual stresses after the first post weld heat treatment. The professional eye of the expert could identify the change in the type of stress being used to analyze the post weld heat treatment and determine that Fluor did not meet the standard of care for an engineer. However, only the expert's bare opinion supports his conclusions that the wrong sort of stress and the wrong point in the hold time were selected intentionally for the purpose of keeping the result below 38,000 p.s.i. Other than testifying to the fact that the type of stress input by Miller in the original finite ele-

ment analysis differs from the type of stress used in the calculations for the extrapolated report, the expert shed no light on why Miller did it other than to state his personal opinion that it was intentional. Although he noted that Miller's work did not meet the standard for an engineer, the expert did not say that no engineer with Miller's training could have possibly done the calculations the way Miller did them by mistake.

Conex argues Fluor's failure to admit to having made mistakes in the report also supports Conex's claim that Fluor recklessly made false representations about Conex having caused high residual stresses. Miller testified that he and the expert hired by Fluor in its defense of Conex's business disparagement suit discovered the thermal conductivity error in August 2006. The mistake, Miller testified, was just that: a mistake that he failed to catch when he performed the analysis and for which he was personally responsible. Miller claimed the other issues involved engineering judgment and experience and were not, in his mind, errors. Fluor could not admit to a mistake it did not know it had made; Fluor's failure to acknowledge the mistakes in Miller's report does not support an inference that Fluor entertained serious doubts about the accuracy of the statements at the time they were made. Furthermore, the fact that Fluor extrapolated the guidelines for the "racetrack" configuration from the spot post weld heat treatments for the main column was certainly disclosed by Fluor to Atofina because Walls mentions it in an email dated October 11, 2001.

Conex relies on Miller's finite element analysis report to support its contention that the appellants acted with malice, but Conex does not explain how Antalffy was personally responsible for Miller's mistakes. Conex does not refer the Court to any evidence that Antalffy was aware in 2001 that Miller had not met the standard of care for an engineer in preparing the report or that Antalffy entertained serious doubts about the truth of the statements in Walls's emails of September 19 or October 22. As to Antalffy, there is no evidence of either publication of false and disparaging words about Conex or of malice. Accordingly, we sustain the appellants' no evidence challenge on Conex's business disparagement claim against Antalffy.

As to Fluor, there is some evidence in the record from which the jury could find that Fluor disparaged Conex in statements five through eight, and that Fluor acted with malice, but the evidence supporting the jury's findings on those elements of Conex's business disparagement claim against Fluor is too weak to support the judgment and the verdict is clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176.

Next, the appellants contend Conex failed to prove it sustained special damages. In *Hurlbut,* the court noted that the plaintiff must establish a pecuniary loss that has been realized or liquidated. *Hurlbut,* 749 S.W.2d at 767. To prevail on a claim for business disparagement, the plaintiff must prove "that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.,* 223 S.W.3d 616, 628 (Tex.App.–Fort Worth 2007, pet. denied). The appellants argue that Conex proved only that it experienced a general decline in sales, but Conex argues that, as a result of Fluor's statements, it incurred extra expenses in the post weld heat treatment for which it was not reimbursed by Atofina. The jury

found those expenses were $1.8 million. In addition, Conex argues it lost the opportunity to work on Atofina's upcoming Deep Conversion Project, which the jury found Conex lost profits of $50 million. Both parties decline to address this element in the briefing on the appellants' first issue, and choose instead to address this element of the disparagement claim in separate damages issues that combine the disparagement claim with the tortious interference claims. Accordingly, we will address the appellants' legal sufficiency challenge to Conex's recovery for special damages with those issues.

We overrule the appellants' no evidence challenge on Conex's business disparagement claim against Fluor, but we sustain the appellants' factual sufficiency evidence challenge on Conex's business disparagement claim against Fluor.

 In their second issue, the appellants challenge the legal and factual sufficiency of the evidence supporting the jury's verdict on Conex's claim for tortious interference with prospective business relations. Tortious interference with prospective business relations requires proof that: (1) there was a reasonable probability Conex and Atofina would have entered into a contractual relationship; (2) Fluor and Antalffy committed independently tortious conduct that prevented the relationship from occurring; and (3) Fluor and Antalffy committed the act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur. *See Wal–Mart Stores Inc. v. Sturges,* 52 S.W.3d 711, 726 (Tex.2001); *Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 859 (Tex.App.–Houston [14th Dist.] 2001, pet. denied). To recover, Conex must prove that the conduct of Fluor and Antalffy would be actionable under a recognized tort. *See Wal–Mart Stores, Inc.,* 52

S.W.3d at 726. Conex cannot recover if Fluor's and Antalffy's persuasion of others not to deal with Conex was lawful, even if their conduct was unfair. *See id.* "[W]hen two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in his pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable." *Id.* at 727. "To be fraudulent a statement must be material and false, the speaker must have known it was false or acted recklessly without regard to its falsity, the speaker must have intended that the statement be acted on, and hearer must have relied on it." *Id.*

The trial court submitted each of the defamatory statements from Question 2 and instructed the jury to find as to each statement whether it found intentional interference that is wrongful because it was committed by fraud. The appellants repeat their arguments from issue one, arguing here that Conex's evidence of scienter is insufficient for the same reasons as the evidence of malice on Conex's business disparagement claim.

In the case relied upon by Conex, a former employee of the plaintiff disclosed the employer's proprietary information in a manner that violated the employee's fiduciary duty to the employer. *RenewData Corp. v. Strickler,* No. 03–05–00273 CV, 2006 WL 504998, at *7 (Tex.App.–Austin Mar. 3, 2006, no pet. h.) (mem. op.). In that case, the court held that the jury could infer a conscious desire to prevent the relationship with a new client from occurring from emails in which the former employee admitted he was pointing out distinctions to better position his new employer. *Id.* at *11.

 In contrast to *RenewData,* in which the tortfeasor breached a duty to the plaintiff, neither Antalffy nor Fluor

owed a duty to Conex. *See id.* at *7. Fluor was hired by Atofina to evaluate Conex's procedures, and Fluor could only have acted tortiously if it made at least one of eight statements, either knowing that the statement was false or recklessly without regard to its falsity. *See Wal–Mart Stores, Inc.,* 52 S.W.3d at 727. Their conduct is actionable by Conex only if Fluor and Antalffy knew at least one of the statements was false or spoke recklessly and without regard to the truth. In our review of the appellants' first issue, we determine there is no evidence that Antalffy did in fact entertain serious doubts as to the truth of the statements about Conex and hold that the evidence that Fluor disparaged Conex is too weak to support the jury's findings that Fluor acted with knowledge of the falsity of the statements or with reckless disregard to their truth. Because there is no evidence that Antalffy committed independently tortious conduct, he cannot be liable for tortious interference with Conex's prospective business relations with Atofina. Because the evidence that Fluor committed independently tortious conduct is factually insufficient, the evidence that Fluor wrongfully interfered with Conex's prospective business relations with Atofina is likewise factually insufficient. We sustain issue two.

Issue three contends the trial court erred in instructing the jury on fraud in Question 3 because Conex did not assert fraud in its pleadings on tortious interference with prospective contracts. Having reversed the judgment on the jury's verdict on Question 3, we do not reach this issue.

We group the appellants' issues fifteen through eighteen on tortious interference with existing contract, as do the parties in their briefs to the Court. Issue fifteen challenges the legal and factual sufficiency of the evidence supporting the jury's find-

ing that Fluor and Antalffy intentionally interfered with the 2001 Turnaround contract between Conex and Atofina. The jury found that both Fluor and Antalffy intentionally interfered with the 2001 Turnaround contract between Conex and Atofina, and that neither Fluor nor Antalffy maintained a good-faith belief that the interference was justified. The jury found actual damages of $1,800,000 for unpaid field change orders in the 2001 Turnaround.

 In issue sixteen, the appellants contend the jury charge precludes Conex's recovery for intentional interference with the 2001 Turnaround contract. The elements of tortious interference with an existing contract are (1) that a contract subject to interference exists, (2) the commission by the defendant of a willful and intentional act of interference with the contract (3) that the willful and intentional act proximately caused injury, and (4) actual damages or loss occurred. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). "Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." *Id.* The appellants contend Atofina had the right to require Conex to perform all work within the scope of the 2001 Turnaround contract at the contract price and to require additional work beyond the scope of the contract, to be paid separately by Atofina. Therefore, they argue, any post weld heat treatment that Atofina required of Conex based upon Fluor's recommendation did not interfere with the contract.

 Conex contends actionable interference includes any act which retards, makes more difficult, or prevents performance, and can include any act that makes performance of the contract more burdensome or more difficult, or of less value to the one entitled to performance. *See Seel-*

bach v. Clubb, 7 S.W.3d 749, 757 (Tex. App.–Texarkana 1999, pet. denied); *Int'l Union of United Auto. Aerospace & Agric. Implement Workers of Am. Local 119 v. Johnson Controls, Inc.*, 813 S.W.2d 558, 568 (Tex.App.–Dallas 1991, writ denied). Although the act of interference need only make the performance of the contract more difficult to establish damage to the plaintiff, the defendant's intent must be to effect a breach of the contract. *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730–31 (Tex.App.–Austin 2000, pet. denied). It is with regard to the damages element for which "any act which retards, makes more difficult or prevents performance" will suffice. *Bellefonte Underwriters Ins. Co. v. Brown*, 663 S.W.2d 562, 573 (Tex.App.–Houston [14th Dist.] 1983), *aff'd in part, rev'd in part on other grounds*, 704 S.W.2d 742 (Tex.1986). Because the defendant must knowingly induce one of the contracting parties to breach its obligations, Conex had to prove that Fluor and Antalffy either desired to cause a breach of the contract between Conex and Atofina, or that they believed a breach was substantially certain to result. *See Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex.1992).

Conex argues the various emails in the record demonstrate that Fluor's and Antalffy's actions were intentional. Conex relies on the eight statements that form the basis of its claim for business disparagement to argue that misrepresentations by Fluor and Antalffy, such as the representation that WRC–452 as a cutting-edge technical requirement, demonstrated that Fluor's and Antalffy's conduct was "nothing more than an attempt to get in the way of Conex's longstanding and profitable relationship with [Atofina]." Conex concedes, however, that when the contract was signed, there was no written procedure in place for post weld heat treatment. An exhibit incorporated into the contract included the following statements: (1) "Stress relieving is included as indicated by the drawings" and (2) "Stress relieving is based on local heating of attachment welds and/or nozzles to large vessels over 5'–0" diameter. On attachments and/or nozzles to smaller vessels, full circumferential bands will be used." The same exhibit included the following statements: (1) "Specialty subcontractors such as stress relieving ... will be reimbursed at cost (including sales tax if applicable) plus 5% markup"; (2) "We will submit fixed prices for additional work. If additional work activities are undefinable, the reimbursable rates above will apply" and (3) "We will work closely with ATOFINA personnel to resolve any differences for Fixed Price extras if required. If agreement cannot be reached, we will work the additional activity on a timesheet basis per the reimbursable rates above."

The contract between Atofina and Conex provided for extra work orders and established a procedure for resolving disputes. Thus, if the post weld heat treatment was extra work, the contract provided that Atofina could require Conex to perform the work and Conex could require Atofina to pay for it. Therefore, the act of inducing Atofina to require post weld heat treatment not contemplated by the parties in the original specifications for the project could not by itself be an inducement to Atofina to breach the contract. The dispute between Atofina and Conex arose because Conex billed Atofina $2.1 million for the extra work and Atofina's project manager, John Carrens, disagreed with the scope of the original work that was required under the contract. Conex's contract with Atofina provided that correction of errors and omissions by the contractor could not be considered a basis for extra work by the contractor. A breach by Atofina, it follows, would be the act of refusing

to pay for the extra work that it ordered but that was not corrective action by Conex.

 There is evidence in the record that by submitting a finite element analysis that called for extensive post weld heat treatment, Fluor employee Miller induced Atofina to require Conex to perform work that was not included in the description of the work contained in the 2001 Turnaround contract. The more difficult issue is whether Fluor and Antalffy were aware at the time Atofina required performance of the extra work by Conex that requiring the work to be done was reasonably certain to induce a breach of the contract; that is, that Atofina would require extra work to be done for which it would refuse to pay. Although Walls distributed his October 22 and October 24 emails after the work on the project concluded, a draft email sent to Miller on October 8 stated, "the intent is to make sure my management understands why we are doing this." This is some evidence that Walls anticipated a dispute with Conex and that Miller knew Walls anticipated a dispute as early as October 8, 2001. If Fluor realized the post weld heat treatment was extra-contractual work, but induced Atofina to refuse to pay for the work because Fluor falsely claimed the post weld heat treatment had caused high residual stresses, the jury could infer that Fluor committed an act that was substantially certain to induce a breach of the contract.

Little evidence supports the inference that Fluor was aware of the potential for a contractual breach by Atofina. One of Conex's experts testified that Conex's initial written proposed treatment procedure exceeded minimum code requirements. The series of emails shows that after the fact, Atofina decided to document why it required the "racetrack" post weld heat treatment, that Miller helped Walls make a record of the matter, and that Antalffy agreed with Walls's memorandum. Nothing in the emails implies that Atofina did not intend to pay for extras or that Fluor encouraged Atofina to refuse to pay for field change orders it was contractually required to pay. The fact that the emails were prepared and revised with Miller's assistance provides some evidence from which the jury could find Fluor realized its participation in the drafting of the emails was substantially certain to induce a breach of the contract. Thus, the jury's finding is supported by legally sufficient evidence on the issue of Fluor's intent. That evidence is too weak, however, to support the verdict in the face of Fluor's factual sufficiency challenge.

The only evidence identified by Conex regarding Antalffy's inducement of a breach of contract is Antalffy's reply to Walls that "You hit the nail on the head." As was the case with its other claims, Conex relies on Antalffy's "emphatic" approval of Walls's comments, which Walls based on Miller's flawed finite element analysis report, but does not refer the Court to any evidence that Antalffy was aware in 2001 that Miller had not met the standard of care for an engineer in preparing the report or that Antalffy had reason to doubt the truth of the statements in Walls's emails on October 24, 2001.

 Furthermore, while some inference might be drawn that by agreeing to the email, Antalffy was tacitly endorsing a plan for Atofina to refuse to pay Conex for the field change orders, the appellants' seventeenth and eighteenth issues contend the evidence conclusively establishes that the appellants' interference was privileged or justified, and that they acted because of a good faith belief that they had a legal right to do so. The jury failed to find either defendant acted because of a good faith belief that there was a right to do so.

Justification is an affirmative defense to tortious interference with contract based on either the exercise of "(1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996). If a defendant cannot establish a legal right as a matter of law, he may prevail on his justification defense if (1) the defendant interfered while exercising a colorable legal right and (2) the defendant exercised the colorable legal right in good faith. *Id.*

■ In the absence of any evidence that in the record that establishes that Antalffy knew on October 24 that the statements in Walls's email were false or that Miller's analyses contained significant errors, all the evidence shows is that Antalffy was providing advice within the scope of his duties as project manager for Fluor on the Atofina 2001 Turnaround. Although the jury failed to find that Antalffy acted in good faith, no evidence supports that finding, and all of the evidence in the record demonstrated objective good faith on the part of Antalffy. Antalffy revealed an awareness that Miller and Kirkpatrick had worked late hours under a severe time crunch, but Conex points us to no evidence in the record from which the jury could draw the inference that Antalffy knew the job had not been done properly.

Fluor was hired to work on the guidelines for stress relieving the welds at issue in the 2001 Turnaround. Therefore, it exercised a colorable legal right when it communicated with Atofina about the post weld heat treatment. The jury could infer from Miller's flawed finite element analysis, as well as the testimony of Conex's expert, that Miller had a reason to suspect its reliability, however, and the jury could infer from Miller's assistance with Walls's emails that Miller was aware that the post

weld heat treatment triggered a dispute between Conex and Atofina over whether the post weld heat treatment was extra work. Thus, there was some evidence in the record from which the jury could reject Fluor's assertion that it acted in objective good faith.

The evidence adduced at trial is legally insufficient to support the judgment against Antalffy on Conex's claim for tortious interference with existing contracts and factually insufficient to support the judgment against Fluor on Conex's claim for tortious interference with existing contracts. We sustain issues fifteen through eighteen in part. Because we have found the evidence to be legally insufficient as to all claims against Antalffy and have found the evidence to be factually insufficient as to all claims against Fluor, we will address the remaining issues only to the extent they would entitle Fluor to the rendition of a take-nothing judgment.

■ Issues nineteen through twenty-four address the jury's finding of $1.8 million in unpaid extras. Fluor contends Conex failed to prove that Fluor caused Conex to do the extra work for which Conex billed Atofina $2.1 million. First, Fluor notes that seven of the eight statements that form the basis for liability are contained in emails that post-date the work. As we have already noted, the emails describe conversations that occurred earlier. Furthermore, the work was complete by October 24, but the dispute over payment was not resolved until December. Second, Fluor contends it could not have caused Conex to do the extra work because only Atofina could have made the decision to require Conex to perform the extra work. The jury could reasonably find from Walls's emails that Miller's finite element analysis prompted Atofina to direct Conex to perform the additional work. A letter dated October 9, 2001, from Conex's chair-

man John Duplissey to Atofina's project manager John Carrens, explained that Conex would not continue the project unless Atofina approved an estimated $887,000 for the work brought about by "engineering miscues and revisions." There is some evidence from which the jury could find that Fluor's work on the Turnaround prompted Atofina to contest its contractual liability for the field change orders and that the dispute over paying for the extras arose because Conex disagreed with Fluor's guidelines, which were provided to Atofina as a result of a flawed finite element analysis.

On December 20, 2001, Conex and Atofina settled the disputed extras and executed the following document:

> The enclosed check of ATOFINA Petrochemicals, Inc. for $371,707.00 (FCR 311, FCR 350 and FCR 351) is in full and complete settlement of the disputes between Conex Inc. and ATOFINA and acknowledges full and final payment for work done during the 2001 FCCU Enhancement Project and T/A. This work is covered in Contract 7375–000T, (Base Scopes and IFC *vs.* IFC Drawing changes FCR 1 through FCR 6) and Contract 7375–001T, FCR 7 through FCR 351.

On appeal, Fluor contends there is no evidence that Fluor caused Conex to settle its claim with Atofina for less than Conex was owed. Because we have determined that the evidence is factually insufficient and the case against Fluor must be retried, Fluor can obtain a more favorable judgment only if as a matter of law Conex's acceptance of the $371,707 settlement precludes Conex from recovering tort damages from Fluor.

 "The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed." *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex.1990). To recover on a suit for tortious interference with an existing contract, the contract need not have been breached so long as the plaintiff incurred damages. "Although breach of the interfered-with contract is probably the most common measure of damage, tortious interference does not limit the damage for the tort to that alone." *Fridl v. Cook,* 908 S.W.2d 507, 513 (Tex.App.–El Paso 1995, writ dism'd w.o.j.). In this case, there is some evidence that Conex expended more than $371,000 in complying with the flawed post weld heat treatment guidelines developed by Fluor. Conex's president, Jimmy Duplissey, testified that Conex accepted $371,707 from Atofina because that was all Atofina had in its budget, and Conex wanted to maintain its business relationship with Atofina.

Fluor argues that Conex waived its right to recover from Fluor because Conex intentionally surrendered any right to the "unpaid extras" and engaged in conduct inconsistent with asserting its claims. Fluor relies on *Johnson v. Structured Asset Svcs., LLC,* 148 S.W.3d 711, 722 (Tex. App.–Dallas 2004, no pet.). *Johnson* involved an interpleader in a contract dispute. *Id.* at 716, 728. The person who assigned his rights to structured settlement payments waived any contractual right he had to assert the anti-assignment provision of the settlement agreement and could not take a position inconsistent with the agreement. *Id.* at 724. This case involves tort claims; although the receipt of payment and the recitals in the document that accompanied payment are evidence that Conex was compensated for its extra work and therefore was not damaged

by any interference from Fluor, the acceptance of payment from Atofina is not an intentional relinquishment of Conex's claims against Fluor. We address issues nineteen through twenty-four only to the extent those issues present arguments for rendition of a take-nothing judgment, and to that extent we overrule those issues.

Issues four through nine and issue thirteen address Conex's recovery of lost profits.[3] Issue four contends legally insufficient evidence supports the jury's findings of $8.5 million for past lost profits, $8.5 million for future lost profits other than profits related to the Atofina Deep Conversion Project, and $50 million for lost profits for the Atofina Deep Conversion Project. Issue five contends Conex provided legally insufficient evidence that Fluor's conduct was a "but for" cause of Conex's loss of work from Atofina. Issue six argues Conex failed to adduce any expert testimony on causation with regard to lost profits. Issue seven argues Conex failed to adduce legally sufficient evidence of lost profits. Issue eight contends Conex failed to adduce reliable expert testimony supporting the amount of lost profits. Issue nine contends Conex produced no evidence of "net" profits and failed to subtract all variable costs from its profits computation. Issue thirteen contends the amounts found by the jury are not supported by legally sufficient evidence. Because we have already determined that a new trial must be had on liability issues, we only consider whether all recovery is barred due to the plaintiff's failure to establish the fact of lost profits, not the amount. *See Sw. Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938).

■■■ Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Tex. Instruments Inc.*

v. *Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex.1994). The amount of the loss must be shown by competent evidence with reasonable certainty, and the injured party must do more than show that it suffered some lost profits. *Id.* "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "[At] a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits [may] be ascertained." *Id.* "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits." *Id.* at 85. "Recovery of lost profits must be predicated on one complete calculation." *Id.*

■■■ Conex presented Charles Hawkins as an expert on lost profits calculations. Hawkins is a professor of economics who offered his expert opinion on the economic impact of Fluor's conduct on Conex. Fluor contends Hawkins's testimony is based upon speculation and is so unreliable that it provides no evidence of lost profits sustained by Conex. Hawkins did not offer an opinion on causation, but limited his opinion to the amount of lost profits based upon his analysis of Fluor's Atofina contracts for 1994–2001 and 2002–2006. Hawkins was not familiar with what the normal profit margin for a mechanical contractor would be. Hawkins did not analyze or evaluate the job cost analysis provided to him by Conex. He did not include any overhead component in his calculations. Hawkins included profits earned through an exclusive maintenance contract that was in effect in the 1990's but which terminated in 1998, prior to the 2001 Turnaround.

---

**3.** Issues ten through twelve and issue fourteen also concern Conex's recovery for lost profits, but none of those issues could result in a rendition for Fluor.

To compute past lost profits, Hawkins computed Conex's average yearly billings to Atofina for the eight-year period through the 2001 Turnaround, then computed Conex's average yearly billings for the five-year period following the 2001 Turnaround, then assumed a 21% profit on the difference between the two averaged figures. It does not appear that Hawkins considered the contracts Atofina actually awarded for the five-year period following the 2001 Turnaround, nor does it appear that he considered the contracts actually awarded to contractors other than Conex for the period that preceded the Turnaround. He did not consider whether there was a downturn in business at the refinery between 2002 and 2004 or whether Conex made competitive bids from 2002 to 2007. In other words, Hawkins provided no evidence of specific lost sales required to recover for business disparagement. See Hurlbut, 749 S.W.2d at 766.

Furthermore, Hawkins did not consistently apply his methodology. Although Hawkins included both turnaround work and large capital expenditures in reaching his conclusion regarding Conex's lost profits, Hawkins based his opinion on lost future profits on past performance only when it benefited Conex, and he eschewed historically-based averaging when it came to the deep conversion project. There, Hawkins used the profit margin from his previous calculations but not the averaged income and costs. After employing his averaging methodology to compute both past lost profits and future lost profits, Hawkins supplied a separate calculation for the proposed deep conversion project. Thus, he did not supply one complete calculation, but provided piecemeal computations based on different methods of calculation. Employing mixed methodologies renders his opinion on lost profits unreliable. See Holt Atherton, 835 S.W.2d at 85.

Conex contends the testimony of John Duplissey supplies legally sufficient evidence that Conex lost profits as a result of Fluor's conduct. Duplissey testified regarding Conex's profits based on his personal knowledge and expertise in running the company. According to Duplissey, when he bid a job at a 28% profit, he obtained the bid 60 to 70% of the time. Before the turnaround, Conex was bidding on approximately $12 million per year in Atofina jobs on a business model under which Conex obtained 62 % of the work. Since 2002, the average amount of work that Conex has done for Atofina is about half of the lowest year since 1988. Thus, there is some evidence in the record that Conex has lost profits from Atofina projects after the 2001 Turnaround. Conex's failure to provide reliable expert testimony of the amount of those lost profits would not entitle Fluor to a take-nothing judgment. See Sw. Battery Corp., 115 S.W.2d at 1099 ("uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery"). Therefore, we address issues four through nine and thirteen to the extent those issues present arguments for rendition of a take-nothing judgment, and to that extent we overrule those issues.

Because we hold there is insufficient evidence to support the liability findings that form the basis for the jury's award of actual damages, we must also reverse the award of exemplary damages. See Twin City Fire Ins. Co. v. Davis, 904 S.W.2d 663, 665 (Tex.1995); Juliette Fowler Homes, Inc. v. Welch Assocs., Inc., 793 S.W.2d 660, 667 (Tex.1990). Accordingly, we reverse the judgment on exemplary damages without deciding the merits of Fluor's issues twenty-five through thirty.

If sustained, the remaining issues raised in the appellants' brief would not result in greater relief to the appellants. There-

fore, we decline to address those issues. *See* Tex.R.App. P. 47.1.

We hold that insufficient evidence supports the judgment entered on the jury's findings. Therefore, we reverse the judgment of the trial court. We render judgment that Conex International Corporation take nothing in its suit against Leslie Antalffy. We remand the case for a new trial on Conex International Corporation's claims against Fluor Enterprises, Inc., f/k/a Fluor Daniel, Inc.

REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.

DAVID GAULTNEY, Justice, dissenting.

The Conex version of events, accepted by the jury, is straightforward. Fina did not pay Conex for some extra work involved in post-weld heat treatment—work costing Conex over $2 million. There is evidence Fluor told Fina the extra work was required because post-weld heat treatment provided by a Conex subcontractor caused "very high residual stresses" in a concentrated area, likely leading to "loss of creep life." Understandably, Fina did not want to accept loss of design life. From the email exchange, it appears Fluor helped draft emails explaining to Fina's management that the additional work was required because, despite "expectations," heat treaters "and the constructors that use them" do not always "keep up with the technical requirements and developments in that industry" or "have the expertise to implement them." Some vendors "may have ignored the evaluation requirement," the writer explained. The evidence indicates the email writer, a Fina employee, was quoting or paraphrasing statements made by Fluor to him. Before sending an October 24, 2001, email, the Fina employee asked Fluor for assurance he had not "misquoted" Fluor, and he also asked Fluor about a draft, "Did I get it right?" In the final version of his email, he asked Fluor to "please advise if I have misquoted any of this[.]" He was told, in effect, the quotes were correct: that he "hit the nail on the head"; and that his "response was exactly correct." The jury reasonably could conclude the disparaging statements were Fluor's, and were reported by the Fina employee to his management to explain "why we are doing this."

The record supports a conclusion that the statements were about Conex—the "constructor" and one of the blamed "vendors"—and the heat treatment just performed. Considerable evidence establishes Fluor's calculations were incorrect.

Proof that the false statements resulted from negligence would be insufficient to impose liability on Fluor. Hired by Fina to evaluate the work, Fluor was entitled to criticize the work, though mistakenly. However, Fluor had no privilege to maliciously make false statements disparaging Conex, even if those statements were made in an attempt to protect Fina from the cost of paying for the extra work Fluor said was required. The tort of business disparagement is an action for special damage resulting from an injurious falsehood maliciously made. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766, 768 (Tex.1987)("[T]he tort itself incorporates malice as an element of recovery; hence, if the plaintiff carries his burden, he likewise defeats any conditional privilege."). Fluor crossed a line in maliciously and falsely attributing the need for the extra work to incompetence by Conex.

The evidence is conflicting, and the jury is the judge of witness credibility. On this record, a reasonable jury could conclude that Fluor proceeded with reckless disregard for the truth in maligning Conex.

Proof of special damages is an essential element of the business disparagement tort. *Id.* at 767. "Special damage" means pecuniary loss that has been realized or liquidated, as in the case of specific lost contracts. *See id.* From the evidence, the jury reasonably could conclude Fluor's misconduct resulted in a realized pecuniary loss to Conex of more than $2 million over the amount Conex was obligated to perform under the contract. On this record, the jury reasonably could conclude that to justify this expenditure of money, Fluor falsely disparaged Conex, and did so with reckless disregard for the truth or falsity of the disparaging remarks. The jury apparently believed that because Fluor falsely ascribed incompetence to Conex, Fina did not honor its contract to pay for the extra work. The jury heard the context in which the statements were made, and the statements cannot be fully understood outside the somewhat complex circumstances. Considering the evidence supporting and contrary to the jury's answer to question 2, the finding does not appear clearly wrong, nor does it seem manifestly unjust. The jury reasonably could conclude Fluor's misconduct caused the special damage found by the jury in answer to question 5. The Court should affirm the $1.8 million award of damages caused in the 2001 turnaround, because the evidence supports the jury's answers to question 2 (business disparagement) and question 5 (the 2001 turnaround damages).

However, the Court should reverse the remainder of the judgment and render a take-nothing judgment as to all other damages, because the evidence is legally insufficient to support damages beyond the $1.8 million. Generally, lost profits not tied to a specific contract are not recoverable in a business disparagement claim, because they are not the type of special damage for which this tort action provides a remedy. *Id.* ("The requirement goes to the cause of action itself and requires that plaintiff 'establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales.'") (quoting W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 128, at 971 (5th ed.1984)). Even the "Deep Conversion Project" is insufficient evidence; the project is only speculative evidence of lost profits. Evidence of a decline in profits unconnected to a specific lost contract is no evidence of the special damages necessary for this tort cause of action. A general loss of profits is not recoverable based only on the jury's answer to question 2 (business disparagement).

The jury's findings in response to question 3 (interference with prospective relations) are essentially business disparagement liability findings, like question 2, because the alternative of fraud, embedded in question 3, is not supported by any pleading. Plaintiff did not plead fraud. As a result, the "lost profit" damages found in response to question 6 are not recoverable on the jury's answer to question 3, for the same reason they are not recoverable on the jury's answer to question 2.

There is legally insufficient evidence to support the jury's finding in answer to question 11—that Fluor had "a specific intent to cause substantial injury to Conex." Sufficient evidence supports the jury finding that Fluor acted with reckless disregard for truth or falsity, but other than speculation of intent by some witnesses, that is all that was shown. Because the punitive damage award in response to question 12 is conditioned on a "yes" finding to question 11, the award of punitive damages has no basis.

The Court should affirm the judgment in part, and reverse and render judgment in part. I respectfully dissent from this

Court's judgment remanding the cause for a new trial.