REVISED March 2, 2021

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50340

United States Court of Appeals
Fifth Circuit

**FILED**
February 26, 2021

Lyle W. Cayce
Clerk

WICKFIRE, L.L.C.,

> Plaintiff–Appellee,

v.

LAURA WOODRUFF; TRIMAX MEDIA, L.L.C.,

> Defendants–Appellants,

v.

WREI, INCORPORATED; JOSH WEST,

> Defendants–Third Party Plaintiffs–Appellants,

v.

JONATHAN CURTIS BROWN; CHESTER LEE HALL,

> Third Party Defendants–Appellees.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:14-CV-34

Before OWEN, Chief Judge, and DENNIS and SOUTHWICK, Circuit Judges.
PRISCILLA R. OWEN, Chief Judge:

No. 17-50340

TriMax Media, L.L.C. appeals a jury verdict in favor of WickFire, L.L.C., challenging subject matter jurisdiction and the sufficiency of the evidence. We affirm the judgment in part and reverse in part.

**I**

WickFire, L.L.C. and TriMax Media, L.L.C. are competitors "in the pay-for-performance search engine marketing business," a form of internet marketing.[1] Advertisers such as WickFire and TriMax Media partner with merchants on advertising campaigns. In addition to contracting with merchants directly, advertisers often connect with merchants through intermediary, affiliate networks that have relationships with thousands of merchants. Search engines like Google conduct auctions in which advertisers can bid for the right to place merchant-specific advertisements alongside particular search terms (for Google, these are called "AdWords auctions"). Advertisers pay search engines on a cost-per-click basis, meaning they pay the search engine every time a user clicks on one of their advertisements. If the user thereafter makes a purchase on the merchant's site, the merchant pays a commission to the advertiser.

A series of disputes arose between WickFire and TriMax Media. In response, WickFire filed suit against TriMax Media, Laura Woodruff (TriMax Media's owner), Josh West (TriMax Media's director of business development), and WREI (a company owned by West) (collectively, TriMax). WickFire asserted a violation of § 43(a) of the Lanham Act, tortious interference with existing contracts, tortious interference with prospective economic relationships, and civil conspiracy.

First, WickFire alleged that TriMax committed "click fraud" by

---

[1] *Wickfire, LLC v. Woodruff*, No. A-14-CA-00034-SS, 2017 WL 1149075, at *1 (W.D. Tex. Mar. 23, 2017).

No. 17-50340

repeatedly clicking on WickFire's advertisements without any intention of making purchases.  Practically speaking, click fraud drives up WickFire's costs—which as noted, are based on the number of clicks per advertisement—without any corresponding increase in revenue.  Second, WickFire alleged that TriMax created false advertisements that were made to appear as though they belonged to WickFire.  WickFire asserted that advertisements included the mark of, and links and references to TheCoupon.co, a WickFire website designed to "aggregate[] coupons for . . . online retailers."  Other advertisements contained WickFire's unique tracking number (606880), which merchants use to identify the source of particular advertisements.  According to WickFire, the advertisements "violated merchant [and] affiliate network[] terms and conditions," thereby interfering with WickFire's contractual relationships with these entities.

In response to WickFire's claims, TriMax filed their own counterclaims against WickFire and its cofounders Jonathan Brown and Chet Hall.  TriMax alleged tortious interference with existing contracts.  First, TriMax alleged WickFire engaged in predatory bidding during Google AdWords auctions.  The alleged predatory bidding involved WickFire's indirect advertising model, whereby WickFire would link customers not directly to a merchant's website, but to TheCoupon.co (or, when originally testing whether the TheCoupon.co was a worthwhile venture, to WebCrawler.com, a public website).[2]  TriMax alleged WickFire would place these indirect advertisements directly below TriMax advertisements and then bid aggressively during Google AdWords auctions to drive up the cost-per-click TriMax would pay for their advertising space.[3]  Once TriMax could no longer compete for the space, WickFire would

_____

[2] *See id.* at *2 n.4.

[3] *Id.*

3

purchase the space at auction for a reduced price.[4]  Second, TriMax alleged WickFire had paid "kickbacks to agents to push merchants to terminate" their affiliations with TriMax.  WickFire, Brown, and Hall raised a justification defense to TriMax's claim.

The district court held a trial on the merits.  The jury awarded WickFire $1,984,000 in damages on its tortious interference with existing contracts claim and $334,000 in damages on its tortious interference with prospective business relations claim.  With respect to WickFire's Lanham Act claim, the jury found that TriMax "misrepresent[ed] [WickFire] as the source of advertisements by placing advertisements containing identifying information distinctive of [WickFire] in a manner that was likely to cause confusion," but it did not award any damages.  The jury also found that TriMax Media, Woodruff, West, and WREI were all "part of a conspiracy that damaged [WickFire]."  With respect to TriMax's claim for tortious interference with existing contracts, the jury found that WickFire, Hall, and Brown "intentionally interfere[d] with one or more of TriMax's contracts" but "ha[d] a colorable right to" do so.

TriMax contested the jury's verdict in a written motion for judgment as a matter of law and a new trial.  The district court denied both motions and entered judgment in accordance with the jury's verdict.  TriMax appealed.

## II

We first consider whether the district court had jurisdiction to entertain WickFire's claims.  For the first time in this multi-year litigation, TriMax asks this court to dismiss WickFire's claims for lack of subject matter jurisdiction.  TriMax contends that subject matter jurisdiction does not exist over WickFire's Lanham Act claim and that consequently there is no basis to exercise

---

[4] *Id.*

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over WickFire's state-law tort claims.

Federal courts have jurisdiction over a claim brought under a federal statute unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or "is wholly insubstantial and frivolous."[5]   These exceptions "are narrowly drawn."[6]   A claim is wholly insubstantial and frivolous if it is foreclosed by previous decisions of the Supreme Court.[7]   The Court's previous decisions foreclose a claim when the "unsoundness" of the claim "so clearly results from the previous decisions . . . as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy."[8] "[P]revious decisions that merely render claims of doubtful or questionable merit" do not preclude federal jurisdiction.[9]

TriMax first alleges WickFire's Lanham Act claim is foreclosed by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp*.[10]   In *Dastar*, Fox Film Corporation (Fox) was assigned the copyright to the *Crusade in Europe* (*Crusade*) television series but did not renew that copyright when it expired.[11]   Years later, the Dastar Corporation (Dastar) obtained publicly available tapes of the series, edited them to make a new series entitled *World War II Campaigns in Europe* (*Campaigns*), and then sold *Campaigns* to consumers without any reference to the original series.[12]   Fox

---

[5] *Bell v. Hood*, 327 U.S. 678, 682-83 (1946).

[6] *Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981).

[7] *See Hagans v. Lavine*, 415 U.S. 528, 543 (1974) (citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666-67 (1974)).

[8] *Id.* at 538 (quoting *Ex Parte Poresky*, 290 U.S. 30, 32 (1933)).

[9] *Id.*

[10] 539 U.S. 23 (2003).

[11] *Id.* at 25-26.

[12] *See id.* at 26-27.

## No. 17-50340

and several *Crusade* distributors sued Dastar for violation of § 43(a) of the Lanham Act,[13] which prohibits a person from making, "in connection with any goods or services," a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities."[14]  Fox and the plaintiff-distributors alleged that by selling *Campaigns* without any reference to the *Crusade* series, Dastar had made a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which [was] likely to cause confusion . . . as to the origin [of *Campaigns*]."[15]

Whether Fox asserted a valid Lanham Act claim against Dastar turned on which entity constituted the "origin" of a particular "good" for purposes of the Act.[16]  "If 'origin' refer[red] only to the *manufacturer* or *producer* of the physical 'good[]' that [was] made available to the public[,] Dastar was the origin," and Fox's Lanham Act claim would accordingly fail.[17]  But if "'origin' include[d] the *creator* of the underlying work," Fox's Lanham Act claim had possible merit.[18]  In deciding which interpretation was correct, the Court relied on the interplay between copyright and patent law on the one hand, and federal trademark law on the other.[19]

Copyright and patent law, the Court indicated, serve markedly different functions than federal trademark law.  The former are intended to "protect originality or creativity," whereas the latter is not.[20]  That is, "[f]ederal

---

[13] *See id.* at 27.
[14] 15 U.S.C. § 1125(a)(1)(A).
[15] *Dastar*, 539 U.S. at 31 (internal quotation marks omitted) (quoting § 1125(a)(1)(A)).
[16] *See id.*
[17] *Id.* (emphasis added).
[18] *Id.* (emphasis added).
[19] *See id.* at 33-34, 37.
[20] *Id.* at 37.

trademark law 'has no necessary relation to invention or discovery.'"[21]  It is instead concerned with "preventing competitors from copying 'a source-identifying mark'" in a way that harms the various consumers who rely on the mark and the manufacturer who owns the mark.[22]  It protects the *genuineness* of goods or services, ensuring, inter alia, that consumers are not deceived into purchasing inferior products and that a manufacturer's goodwill is not exploited or infringed upon by its competitors.[23]

The Court concluded that the term "origin of goods" as used in the Lanham Act "refer[red] to the *producer* of the tangible goods that [were] offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."[24]  Accordingly, Fox—the putative "entity that originated the ideas or communications" embodied in Dastar's film—could not sue Dastar for violating the Lanham Act merely because Dastar had not provided Fox attribution for those original ideas and communications.[25]  To the extent protections for those interests exist, they lie in the law of copyright, not the law of trademarks.[26]

We understand *Dastar* to stand for the general proposition that one cannot shoehorn what essentially amounts to a putative patent violation or a

---

[21] *Id.* at 34 (quoting *In re Trade–Mark Cases*, 100 U.S. 82, 94 (1879)).

[22] *Id.* (noting that trademark law, "by preventing competitors from copying 'a source-identifying mark,' 'reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product" (alterations in original) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995))).

[23] *See id.* at 32 ("Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill.  It forbids, for example, the Coca–Cola Company's passing off its product as Pepsi–Cola or reverse passing off Pepsi–Cola as its product.").

[24] *Id.* at 37 (emphasis added).

[25] *See id.* at 32, 38; *see also id.* at 27 (describing Fox's allegations "that Dastar's sale of *Campaigns* '*without proper credit*' to the *Crusade* television series constitute[d] 'reverse passing off' in violation of § 43(a) of the Lanham Act" (emphasis added) (footnote omitted)).

[26] *See id.* at 37.

putative copyright violation into a Lanham Act claim.[27]  In other words, there is no cause of action for violating the Lanham Act merely because the "good" at issue incorporates the plaintiff's ideas, concepts, writings, or the like.  In this way, *Dastar* addressed, as TriMax asserts, a "false authorship" claim.  Fox was essentially alleging Dastar had plagiarized the *Crusade* series.[28]  In filing suit, Fox was seeking to rectify Dastar's putative failure to credit Fox for its original ideas.[29]  But because the suit did not seek to protect the interests that prompted the passage of the Lanham Act, Fox's claim failed.[30]

The case at bar presents a different situation than that addressed in *Dastar*.  WickFire has alleged that TriMax created false advertisements appearing to have originated with WickFire in order to, inter alia, harm WickFire's reputational interests in this industry.  WickFire is not alleging TriMax wrongfully incorporated WickFire's ideas or concepts into TriMax's advertisements.  That is, WickFire is not concerned with protecting an original idea or its creative thought, as Fox was attempting to do in *Dastar*.  Instead, WickFire is interested in protecting the genuineness of its brand.  We cannot say, based on *Dastar*, that WickFire's claim is frivolous.[31]

TriMax's second argument as to why the district court lacked jurisdiction to entertain WickFire's federal claim is that neither WickFire's unique

---

[27] *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004) (per curiam) ("The [*Dastar*] Court concluded that claims of false authorship and reverse passing off, *when raised to protect an author's interest in the intellectual content of communicative products*, were not actionable under § 43(a) and should instead be pursued under copyright law." (emphasis added)); *accord Gensler v. Strabala*, 764 F.3d 735, 737 (7th Cir. 2014) ("*Dastar* held that a copyright can't be extended by using the Lanham Act.").

[28] *Dastar*, 539 U.S. at 36 (describing Fox's "reading . . . of the Lanham Act as creating a cause of action for, in effect, plagiarism").

[29] *See id.* at 27.

[30] *See id.* at 37.

[31] *Cf. Gen. Universal Sys., Inc.*, 379 F.3d at 149 (concluding *Dastar* foreclosed the plaintiff's Lanham Act claim because the plaintiff was alleging the defendant had "copied the ideas, concepts, structures, and sequences embodied in [the plaintiff's] copyrighted work").

numerical identifier nor the links or references to TheCoupon.co are entitled to protection under the Lanham Act.  But these arguments principally challenge the *merits* of WickFire's claim—that is, whether WickFire can *prevail* in its cause of action.  They do not effectively challenge the *jurisdiction* of the district court.[32]  Generally, district courts have "jurisdiction if 'the right of the [plaintiff] to recover under [his or her] complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.'"[33]  In other words, the claim need only be "colorable" to invoke federal question jurisdiction.[34]

Here, WickFire alleged that TriMax created fraudulent advertisements intended to deceive WickFire's customers into thinking the advertisements were created by WickFire.  Whether WickFire could have prevailed under that theory turned in part on whether WickFire had a protectable mark.[35]  But WickFire need not have *conclusively* demonstrated the existence of a protectable mark to invoke "arising under" jurisdiction.  Novel as its claim may be, nothing suggests WickFire's legal theory is so insubstantial or frivolous as to affect the district court's authority to decide this case.[36]  We thus conclude

---

[32] *See Fragumar Corp., N.V. v. Dunlap*, 685 F.2d 127, 128 (5th Cir. 1982) ("Federal jurisdiction is determined not by the ultimate evidence but by the well-pleaded allegations of the complaint." (citing *Little York Gold Washing & Water Co. v. Keyes*, 96 U.S. 199, 201-02 (1877))).

[33] *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643 (2002) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).

[34] *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 (2006) ("A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." (citing *Bell v. Hood*, 327 U.S. 678, 681-85 (1946))).

[35] *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235-36 (5th Cir. 2010) (noting that to prevail under § 43(a), "[t]he plaintiff must first 'establish ownership in a legally protectible mark, and second, . . . show infringement by demonstrating a likelihood of confusion'" (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008))).

[36] *See Verizon*, 535 U.S. at 643 (indicating that subject matter jurisdiction is affected if "the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous'" (quoting *Steel Co.*,

No. 17-50340

the district court had jurisdiction over WickFire's Lanham Act claim and, accordingly, pendent jurisdiction over each of WickFire's state-law tort claims.[37]

## III

On the merits, TriMax argues they were entitled to judgment as a matter of law on each of WickFire's claims, as well as the justification defense raised in response to TriMax's counterclaim. "Only when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [a particular] issue' is judgment as a matter of law appropriate."[38] In making that determination, we "draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party."[39]

## A

As to the Lanham Act claim, we need not decide whether the evidence offered was sufficient as a matter of law. The judgment in this case, although acknowledging that TriMax had violated § 43(a) of the Act, did not award WickFire damages as to this claim. Consequently, any argument that WickFire offered insufficient evidence regarding this claim is moot. Nor does the fact that WickFire seeks attorney fees under the Lanham Act affect this conclusion. It is true that the Lanham Act permits, under certain

---

523 U.S. at 89)); *see also U.S. Patent & Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2301 (2020) (concluding that even "term[s] styled 'generic.com'" can, in certain circumstances, "be eligible for federal trademark registration").

[37] *See* 28 U.S.C. § 1367(a).

[38] *Ill. Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 514 (5th Cir. 2020) (quoting FED. R. CIV. P. 50(a)); *see Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) ("A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." (quoting *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000))).

[39] *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016) (quoting *Heck v. Triche,* 775 F.3d 265, 273 (5th Cir. 2014)).

circumstances, district courts to award "reasonable attorney fees to the *prevailing party*."[40] But as we recently noted in *Alliance for Good Government v. Coalition for Better Government*, "a prevailing party [for Lanham Act purposes] is 'a party in whose favor judgment is rendered' or 'one who has been awarded some relief by the court.'"[41] Here, the jury found that there were no damages, and WickFire therefore cannot be a prevailing party under the Lanham Act. We need not consider TriMax's contentions that the evidence as to WickFire's Lanham Act claim was insufficient as a matter of law.[42]

## B

Next, we consider TriMax's contentions that the evidence introduced at trial was not legally sufficient to support the judgment as to WickFire's tort claims or WickFire's and its founders' justification defense. Because each of these contentions is grounded in state law, we "refer to state law for the kind of evidence that must be produced to support a verdict."[43]

## 1

To prevail at trial on its tortious interference with contractual relations claim, WickFire needed to present sufficient proof of the following: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss."[44] At the close of WickFire's case, TriMax challenged the proof offered as to each element in an adequate, albeit generic, Rule 50(a) motion. TriMax renewed that motion after the jury

---

[40] 15 U.S.C. § 1117(a) (emphasis added).

[41] 919 F.3d 291, 295 n.16 (5th Cir. 2019) (quoting *Kiva Kitchen & Bath Inc. v. Capital Distrib., Inc.*, 319 F. App'x 316, 322 (5th Cir. 2009)).

[42] *See Miller v. Travis County*, 953 F.3d 817, 822 (5th Cir. 2020).

[43] *Wackman v. Rubsamen*, 602 F.3d 391, 400 (5th Cir. 2010) (quoting *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004)).

[44] *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (citing *ACS Invs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

returned its verdict, and before this court again argues the claim was infirm as a matter of law. Reviewing de novo, we agree.[45]

Our review of Texas law[46] indicates that to prevail on an interference claim, the plaintiff must "present evidence that some obligatory provision of a contract [was] breached."[47] Intermediate appellate courts in Texas have, on occasion, suggested an actual breach is not required. Relying on those decisions, our own court in *Cuba v. Pylant* noted the following: "Although it does not appear that an actual breach must occur, the defendant must have intended to induce a breach (even if unsuccessful), thereby making performance more difficult in some way that injured the plaintiff."[48]

But since *Cuba* was issued, the Supreme Court of Texas appears to have clarified the law in this area. In *El Paso Healthcare System, Ltd. v. Murphy*, the Supreme Court of Texas stated the following: "To prevail on a claim for tortious interference with an existing contract, [the plaintiff must] present evidence that [the defendant] induced [the plaintiff's co-contracting party] to 'breach the contract,' and thus interfered with [the plaintiff's] 'legal rights under the . . . contract.'"[49] This unequivocal language leaves little doubt that a breach must result from the defendant's conduct in order for the plaintiff to

---

[45] *Heck v. Triche*, 775 F.3d 265, 272 (5th Cir. 2014) ("We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." (quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008))); *see also Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 457 (5th Cir. 2001) ("We decline to adopt an unduly burdensome view of Rule 50 that would require litigants to detail every aspect of a case where . . . a general, all[-]encompassing statement will suffice.").

[46] *See El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421-22 (Tex. 2017).

[47] *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 749 (5th Cir. 2019) (quoting *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)).

[48] 814 F.3d 701, 717 (5th Cir. 2016) (citing *Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 443 (Tex. App.—Beaumont 2008, pet. denied)).

[49] 518 S.W.3d at 421-22 (first quoting *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995); and then quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998)).

prevail. To *induce* commonly connotes not merely *attempts* at interference, but *actual* interference.[50]    Accordingly, without sufficient proof that the defendant's conduct resulted in "some obligatory provision of a contract ha[ving] been breached," the plaintiff's tortious interference claim is infirm as a matter of law.[51]

WickFire offered no such proof. As discussed earlier, WickFire connects with merchants in one of two ways. First, WickFire directly contracts with merchants who are seeking advertising services. These individual, merchant-to-advertiser contracts contain terms and conditions requiring WickFire's advertisements to meet certain standards that are specific to each agreement. In addition to these merchant-to-advertiser contracts, WickFire also connects with merchants en masse through affiliate networks. WickFire likewise maintains contractual relationships with these intermediary affiliate networks that require WickFire's advertisements to meet certain standards. At trial, WickFire argued that TriMax tortiously interfered with both types of agreements—those it maintained with individual merchants and those it maintained with intermediary affiliate networks.[52]

---

[50] *See Induce*, MERRIAM–WEBSTER, https://www.merriam-webster.com /dictionary/induce (last visited Feb. 24, 2021) (defining induce to mean either "to move by persuasion or influence" or "to call forth or bring about by influence or stimulation").

[51] *Walker*, 938 F.3d at 749 (quoting *Better Bus. Bureau*, 441 S.W.3d at 361); *see Duncan v. Hindy*, 590 S.W.3d 713, 726-28, 729 (Tex. App.—Eastland 2019, pet. denied) (affirming summary judgment as to a tortious interference claim because the plaintiff offered insufficient proof that a breach resulted from the defendant's conduct); *see also Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 168 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[T]o establish the element of a willful and intentional act of interference, the plaintiff must produce evidence that the defendant was a more-than-willing participant and knowingly induced one of the contracting parties to *breach* its obligations under the contract. To do so, the plaintiff must present evidence that an *obligatory provision of the contract was breached*." (emphasis added) (internal citations omitted)).

[52] *See Wickfire, LLC v. Woodruff*, No. A-14-CA-00034-SS, 2017 WL 1149075, at *3 (W.D. Tex. Mar. 23, 2017) (noting that "Wickfire offered evidence regarding its merchant and affiliate network contracts and their corresponding terms and conditions").

No. 17-50340

In support of its claim, WickFire unquestionably offered sufficient proof that TriMax *intended* to influence WickFire's relationships with both individual merchants and the various intermediary affiliate networks with whom WickFire contracted.    Nevertheless, WickFire fell short of demonstrating that either it or any of its co-contracting parties *breached* their respective obligations to one another as a result of TriMax's conduct.  TriMax's advertisements may have made it appear as though WickFire breached its obligations.    But there is no indication WickFire actually breached its contractual obligations as a result of TriMax's conduct.  Nor is there any indication WickFire's various co-contracting parties failed to comply with their respective contractual obligations as a result of TriMax's conduct.    Hall testified in conclusory terms that some merchants ceased their affiliations with WickFire as a result of TriMax's conduct.  But without pointing to specific contractual terms that were supposedly breached, a factfinder could only speculate as to whether this conduct in fact amounted to a breach of an underlying contractual term.

WickFire's claim is analogous to the tortious interference claim considered by the Supreme Court of Texas in *El Paso Healthcare System*. There, Murphy, the nurse-plaintiff, "worked as an independent practitioner under contract with West Texas OB Anesthesia in El Paso."[53]  West Texas OB maintained a contractual relationship with El Paso Healthcare's Las Palmas Medical Center whereby it would provide medical staff to the medical center when needed.[54]    "Las Palmas would request staffing for particular assignments, and West Texas OB would offer those shifts to Murphy and its other contractors."[55]  A dispute occurred between Murphy and a physician at

---

[53] 518 S.W.3d at 414.
[54] *See id.*
[55] *Id.*

Las Palmas that prompted Las Palmas to conduct an investigation.[56] Las Palmas asked that Murphy not to be assigned to the medical center during the pendency of the investigation.[57]

Thereafter, Murphy sued Las Palmas for tortious interference, claiming "that [Las Palmas had] interfered with her business relationship with West Texas OB by requesting that [she] not be scheduled at Las Palmas while it conducted its investigation."[58] The Supreme Court of Texas ultimately reversed a jury verdict in Murphy's favor.[59] The court's analysis turned on the fact that "[n]either Las Palmas nor West Texas OB were required to offer Murphy any assignments, and she was not required to accept any assignments that were offered."[60] "To prevail on a claim for tortious interference with an existing contract," the court noted, "Murphy had to present evidence that [Las Palmas] induced West Texas OB to 'breach the contract,' and thus interfered with Murphy's 'legal rights under the . . . contract.'"[61] In Murphy's case, "an obligation to provide employment was not a term of Murphy's existing contract with West Texas OB."[62] Murphy's contract called for payment when she worked, but it did not require West Texas OB "to schedule Murphy at Las Palmas, or indeed at any hospital."[63] Because Las Palmas's actions had not interfered with Murphy's contract, Murphy's tortious interference claim failed as a matter of law.[64]

---

[56] *See id.* at 415, 420.

[57] *See id.*

[58] *Id.* at 420.

[59] *See id.* at 421.

[60] *Id.* at 414.

[61] *Id.* at 421-22 (internal citations omitted) (first quoting *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995); and then quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998)).

[62] *Id.* at 422.

[63] *Id.*

[64] *See id.*

No. 17-50340

Like Murphy, WickFire produced evidence that a third party had a deleterious financial effect on its bottom line. But as was the case in *El Paso Healthcare System*, the record here fails to indicate that WickFire's damages occurred because a co-contracting party breached its agreement with WickFire. The record in this case is devoid of any indication that either an individual merchant or an affiliate network breached a contractual obligation as a result of TriMax's conduct. To the extent an individual merchant or an affiliate network ceased relying on WickFire for its advertising services because of TriMax's conduct, there is no evidence that these entities were *contractually required* to place advertisements with WickFire. Because there is no evidence TriMax's conduct in fact induced any entity to breach an agreement with WickFire, WickFire's tortious interference with contractual relations claim fails as a matter of law.[65]

**2**

Next, we consider the evidence offered in support of WickFire's tortious interference with prospective business relations claim. This claim required proof of the following five elements:

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.[66]

---

[65] Our conclusion should not be misunderstood as an endorsement of TriMax's conduct. Nor should it be taken as a suggestion that WickFire could never have held TriMax liable in tort for this type of conduct. Rather, our conclusion is simply that WickFire's failure to demonstrate specific breaches as a result of TriMax's conduct precludes a finding of liability as to this claim.

[66] *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (first citing *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); and then citing *Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001)).

No. 17-50340

Before the district court, TriMax challenged the sufficiency of the evidence as to each element in both its Rule 50(a) and Rule 50(b) motions. On appeal, TriMax challenges the sufficiency of the evidence as to a number of these elements. We pretermit discussion of all but one. Reviewing de novo,[67] we conclude that the evidence of WickFire's actual damages is insufficient as a matter of law.

To recover lost profits under Texas law, a party "must do more than show that [it] suffered some lost profits"—it must show the amount of profits lost "by competent evidence with reasonable certainty."[68] "What constitutes reasonably certain evidence of lost profits is a fact intensive determination."[69] "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained."[70] However, "it is not necessary to produce in court the documents supporting the opinions or estimates."[71] Although there are a number of valid methods for measuring lost profits, "once a party has chosen a particular method for measuring [its] lost profits, [the party] must provide a complete calculation."[72] "[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."[73]

WickFire's damages theory for this claim was grounded in the assertions that TriMax's tortious conduct delayed the development of TheCoupon.co website by six months and that WickFire lost $334,000 in profits because of

---

[67] *See Heck v. Triche*, 775 F.3d 265, 272-73 (5th Cir. 2014).

[68] *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (citing *Tex. Instruments v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).

[69] *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

[70] *Szczepanik*, 883 S.W.2d at 649 (citing *Holt Atherton*, 835 S.W.2d at 84).

[71] *Holt Atherton*, 835 S.W.2d at 84.

[72] *Id.* at 85.

[73] *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 280 (Tex. 2015) (quoting *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938)).

that delay. When WickFire's damages expert was asked how he calculated that dollar figure, the expert said that he had "quantified those damages by calculating the amount of profits that [WickFire] lost because of the six-month delay." He did not testify as to how he performed that calculation, nor did he point to any data concerning the business generated by TheCoupon.co. This evidence is threadbare and conclusory. We accordingly conclude that WickFire failed to provide a complete calculation showing it lost $334,000 in profits due to TriMax's conduct.

Nor has WickFire presented "legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty."[74] WickFire provided no method at all for calculating the profits lost due to the delay in launching TheCoupon.co. Consequently, the evidence provided by WickFire is not sufficient to prove with reasonable certainty that WickFire lost *any* profits because of the delay in the launch of this website. Although there is evidence in the record that TheCoupon.co was ultimately profitable, that evidence alone does not prove with reasonable certainty that WickFire lost profits due to TriMax's conduct. Because the evidence of damages is insufficient as a matter of law, we reverse the judgment as it concerns this claim.[75]

**3**

We turn now to the civil conspiracy claim. The elements of a civil conspiracy under Texas law are as follows:

> (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or

---

[74] *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877 (Tex. 2010) (concluding that the plaintiff did not provide sufficient evidence to support "the amount of damages awarded by the trial court" but did proffer adequate evidence to prove a lesser amount).

[75] *Phillips*, 475 S.W.3d at 280 (noting that "uncertainty as to the fact of legal damages is fatal to recovery" (quoting *Sw. Battery Corp*, 115 S.W.2d at 1099)).

course of action; and (5) damages occur as a proximate result.[76] But the Supreme Court of Texas has repeatedly emphasized that "civil conspiracy [is] a 'derivative tort,' meaning it depends on some underlying tort or other illegal act."[77] The court's "use of the word 'derivative' in this context means a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it."[78] Here, each of WickFire's underlying claims failed.[79] Consequently, the judgment as to this claim must be reversed.

**4**

Lastly, we consider TriMax's interference with existing contracts claim, specifically the sufficiency of the evidence offered in support of WickFire's, Hall's, and Brown's justification defense. TriMax challenged the sufficiency of the evidence as to this defense in its Rule 50(a) motion. However, they did not move for judgment as a matter of law on this issue under Rule 50(b), instead seeking relief pursuant to Rule 59. In at least one unpublished opinion, we concluded a litigant's sufficiency-of-the-evidence arguments were preserved for appeal in these circumstances.[80] But we need not decide whether the same result should attach here. Even assuming TriMax's arguments are entitled to de novo review, there was sufficient evidence to support the jury's verdict.

Under Texas law, "the affirmative defense of justification can be based on the exercise of . . . a good-faith claim to a colorable legal right, even though

---

[76] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)).

[77] *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-41 (Tex. 2019) (first citing *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008); and then citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).

[78] *Id.* (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 148 (Tex. 1999)).

[79] *See id.* at 142 ("Civil conspiracy requires an underlying tort that has caused damages." (citing *Tilton*, 925 S.W.2d at 681)).

[80] *See Groden v. Allen*, 279 F. App'x 290, 292-93 (5th Cir. 2008) (per curiam).

that claim ultimately proves to be mistaken."[81]    Here, we see nothing to indicate WickFire's putative "kickbacks" or its bidding practices were illegal or tortious, which would, under Texas law, preclude the defense as a matter of law.[82]  The jury also heard ample evidence to support its verdict.

WickFire presented testimony that Google conducts thorough investigations of alleged wrongdoing; that WickFire had been investigated for allegedly problematic bidding practices in the past; and that WickFire had never been told that its practices were problematic or unethical.  There is likewise evidence in the record suggesting Google recommended merchants work with WickFire and evidence that Google made WickFire one of its "premier partner[s]."  Of course, Google is not the "ultimate arbiter" of what conduct is legal or illegal.  Likewise, Google's investigations may have only considered whether WickFire's bidding practices relating to WebCrawler.com—not TheCoupon.co—were within Google's standards.  But the evidence taken in the light most favorable to WickFire supports the conclusion that WickFire believed itself to be operating within the bounds of the law during Google's auctions.

We note that it is not clear whether the jury's verdict was premised on alleged kickbacks or alleged predatory bidding.  But in light of our conclusion that at least one of WickFire's justification-defense theories was supported by sufficient evidence, we need not consider WickFire's alternative justification theory, namely that the putative "kickbacks" were actually a proper business development strategy.  Even assuming WickFire did not present sufficient evidence to support this alternative defense, the verdict must stand.  We "trust

[81] *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017) (citing *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000)).

[82] *See id.* ("The defense does not apply when the interference is by illegal or tortious means, such as misrepresentation or fraud." (citing *Prudential*, 29 S.W.3d at 81)).

No. 17-50340

the jury to have sorted the factually supported from the [allegedly] unsupported."[83]  Accordingly, TriMax is not entitled to judgment as a matter of law on WickFire's justification defense.

*    *    *

TriMax's motion to dismiss is DENIED.  The district court's judgment is REVERSED as to WickFire's tortious interference claims and its civil conspiracy claim.  The judgment is AFFIRMED in all other respects.  The case is REMANDED for further proceedings consistent with this opinion.

---

[83] *Nester v. Textron, Inc.*, 888 F.3d 151, 160 (5th Cir. 2018) (noting that "a jury verdict may be sustained even though not all the theories on which it was submitted had sufficient evidentiary support" (quoting *Prestenbach v. Rains*, 4 F.3d 358, 361 n.2 (5th Cir. 1993))).